IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

v.                                 **Criminal Case No.: 2:23-CR-14**
                                              **(JUDGE KLEEH)**

**ARKMEEM Y. VAUGHN,**

        **Defendant.**

## REPORT AND RECOMMENDATION RECOMMENDING THAT DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 55] BE DENIED

Presently pending before the undersigned Magistrate Judge is Defendant Arkmeem Y. Vaughn's ("Defendant") Motion to Suppress Physical Evidence [ECF No. 55], filed on October 23, 2023. By Referral Order dated October 24, 2023 [ECF No. 56], the Hon. Thomas S. Kleeh, Chief United States District Judge, referred the motion to the undersigned for conducting a hearing and entering a Report and Recommendation as to disposition of the motion.

The undersigned also is in receipt of the Government's Opposition to Suppression Motion, filed on October 31, 2023. [ECF No. 57]. The undersigned conducted a hearing[1] on Defendant's

---

[1] Defendant himself appeared for the hearing by videoconference. Prior to the hearing, Defendant filed a motion [ECF No. 62] requesting permission to appear by videoconference. By his motion, Defendant indicated that the Government did not object to his appearing by videoconference, and did not object to Defendant testifying by videoconference if he chose to do so. (Defendant ultimately did not testify at the hearing). The Court granted [ECF No. 63] Defendant's motion and directed Defendant to provide a fully-executed videoconferencing waiver prior to the hearing. Defendant provided such a waiver, and at the outset of the hearing, the undersigned ordered that the waiver be filed herein. [ECF No. 67]. As set forth on the record during the hearing, Defendant was able to see and hear the entirety of the proceeding in real time, and Defendant was visible and audible to all other participants in the courtroom. Moreover, Defendant was in regular communication with his counsel during the hearing by text message, and the undersigned made clear to Defendant that the Court would take a recess at any point to allow he and his counsel to speak privately by telephone. In fact, Defendant and his counsel availed themselves of that accommodation one time during the hearing. At the conclusion of the hearing, Defendant affirmed that he was able to participate fully and meaningfully in the hearing in its entirety.

1

motion on November 8, 2023, at which the Court heard witness testimony and the arguments of counsel.

Based on a detailed review of Defendant's motion [ECF No. 55], the Government's opposition [ECF No. 57], the witness testimony during the hearing, the arguments of counsel during the hearing, and the entirety of the record and pertinent legal authority, the undersigned respectfully **RECOMMENDS** that Defendant's motion be **DENIED** as set forth herein.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant is named in a two-defendant Indictment which a Grand Jury returned on June 27, 2023. Defendant is named in the Indictment with the offenses of (1) Conspiracy to Distribute Methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846, and (2) Possession with Intent to Distribute Methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

Defendant was operating a vehicle which was the subject of a traffic stop initiated by officers with the Elkins, West Virginia Police Department on July 31, 2022. Elkins is located in Randolph County, in the Northern District of West Virginia. Officers had received an anonymous tip that Defendant and co-defendant Cheryl Marie Smith ("Smith") were staying at a local motel and allegedly were involved in drug distribution activity. An officer surveilled the motel and became aware of the vehicle which Defendant and Smith were using. Also, officers learned that Smith was the subject of an outstanding *capias* arrest warrant. Upon observing Defendant and Smith travelling in the vehicle, officers initiated a stop of the vehicle on the basis of (1) the arrest warrant for Smith and (2) a defect of the vehicle in the form of a cracked windshield.

In the course of the traffic stop, officers discovered marijuana, methamphetamine, a large amount of United States currency, and a drug ledger. Both Defendant and Smith were arrested, and the Indictment herein resulted, by which both Defendant and Smith are charged.

## II. SUMMARY OF TESTIMONY AND ARGUMENT

During the aforementioned suppression hearing on November 8, 2023, the Court heard sworn testimony from two witnesses, namely, (1) Daniel Sayre ("Sayre"), who was working as a patrolman with the Elkins Police Department at the time of events giving rise to the Indictment herein, and (2) Ramone Goux, ("Goux," pronounced gow), who also was working as a patrolman with the Elkins Police Department at that time. The parties did not present any documentary evidence during the hearing.

### A. Sayre's Testimony

The Government called Sayre to testify. According to Sayre's testimony at the suppression hearing,[2] he spearheaded an investigation of Defendant that led to Defendant's arrest. [9:37:50 to 9:39:15]. Sayre testified that the Elkins Police Department received an anonymous tip from a worker at a local motel about two guests at the motel engaged in drug activity. Id. The motel, known variously as the EconoLodge and the Economy Inn, is located on the outskirts of Elkins. Id. The worker who gave the anonymous tip described the guests as a black male and a white female; the worker also provided a description of the pair's vehicle, which included information that it had Ohio tags. [9:39:18 to 9:40:07].

Sayre followed up on the tip on July 30, 2022, by visiting the front desk of the motel and asking an employee there about a black male and a white female staying at motel. Id. The front

---

[2] The citations here to times in brackets correspond to the times of the Court's archived audio recording of the suppression hearing on November 8, 2023, which is located on the section of the Court's intranet site for FTR recordings.

3

desk employee confirmed that a pair of guests matched that description, and provided records pertaining to their room rental, which included a copy of Defendant's driver's license. [9:40:10 to 9:40:44]. Sayre ran Defendant's driver's license through the Randolph County E-911 system, which showed the license to be valid. [9:40:46 to 9:40:52].

Sayre explained that he continued to observe the motel that day. [9:40:58 to 9:41:21]. He drove past it occasionally, and eventually set up surveillance from his patrol vehicle in an adjacent parking lot. Id. The following day (July 31, 2022), Sayre learned from motel staff that the two guests of interest extended their stay, with Smith paying for the extended stay with cash. [9:41:24 to 9:42:04]. From personal knowledge, the front desk attendant knew who Smith was, and relayed her identity to Sayre. Id.

As part of his investigation, Sayre ran the name "Cheryl Smith" through the Randolph County E-911 system. Sayre also had learned that Smith's middle name is "Marie." [9:42:18 to 9:43:05]. And through further inquiry, Sayre learned from the front desk attendant at the motel that Smith had blond hair and that her age was late 40s. Id. These measures helped Sayre confirm Smith's identity despite her having common first and last names. Id.

In the course of his investigation, Sayre learned that Smith was the subject of an active *capias* warrant from Monongalia County, West Virginia. [9:43:13 to 9:43:19]. Sayre also obtained a photograph of Smith from Randolph County E-911. The photograph was from Smith's driver's license. Sayre was able to obtain Smith's date of birth, too. Although Sayre had not yet encountered Smith personally, these measures aided Sayre in ascertaining that the female guest of interest at the motel was Smith. [9:43:20 to 9:44:48].

On July 31, 2022, Sayre got call from a motel employee that Defendant and Smith were leaving the motel. [9:45:13 to 9:45:27]. At that time, Sayre was parked in a marked police vehicle

in a nearby parking lot. [9:45:29 to 9:46:04]. Sayre was positioned such that he first saw Defendant and Smith in their own vehicle after they exited the motel parking lot, approximately 25 yards beyond the exit. [9:46:10 to 9:46:23]. The pair were traveling toward Elkins. Id. As Sayre saw the pair's vehicle pass by, he observed Defendant operating the vehicle and, in the passenger seat, observed a female matching Smith's description. [9:46:25 to 9:46:43].

Sayre initiated a stop of vehicle on basis of Smith's arrest warrant and because the vehicle had a cracked windshield. [9:46:47 to 9:47:04]. Sayre testified that, because of Smith's arrest warrant, he had a duty to make the stop to effect an arrest. [9:47:07 to 9:47:17]. He also testified as to the cracked windshield. [9:47:17 to 9:47:55]. Sayre said that, to the best of his recollection, the crack spanned the width of the windshield. Id. Sayre stated that the cracked windshield violated two West Virginia traffic laws – one that prohibits defective equipment, and one that prohibits the obstruction of view. Id.

Sayre testified as to how another officer, Goux, was involved in the traffic stop. [9:48:31 to 9:49:04]. Goux was immediately behind Sayre in his own patrol vehicle, and arrived at the scene of the stop at virtually the same time that Sayre initiated it. Id.

Sayre testified that Defendant pulled over appropriately for the traffic stop. [9:49:20 to 9:49:23]. At the outset of the stop, Sayre made contact with Defendant (the driver) while Goux made contact with Smith (the passenger). [9:49:24 to 9:49:40]. Smith was in the process of exiting the vehicle when Goux ordered her to stop. Id. Sayre asked Defendant if there was anything illegal in the vehicle, and Defendant provided two cigar wrappers containing a green, leafy substance consistent with marijuana. [9:49:43 to 9:51:08]. Such marijuana is illegal to possess in West Virginia. [9:51:19 to 9:51:23].

5

Sayre had Defendant step out of the vehicle, and detained Defendant pending a search of the vehicle. [9:51:25 to 9:53:39]. Goux also engaged in a search which focused on Smith, and alerted Sayre that he located a crystal-like substance that appeared to be methamphetamine. Id. Goux found the methamphetamine on Smith's person and inside her shoes. Id. Goux also found a drug ledger in Smith's purse. Id. For his part in the search, Sayre found a red backpack in the vehicle. Id. In the backpack, Sayre found a large amount of United States currency, totaling approximately $7,000.00. Id.

On cross-examination, Sayre stated that, in his conversations with motel employees, he did not ask if there were other mixed-race couples staying at the motel. [9:54:38 to 9:54:46]. He stated that motel employees did not provide surveillance footage of the premises, and that the tipster from the motel did not provide information about the precise date the suspected drug activity began. [9:54:55 to 9:55:53]. In speaking with employees of the motel, they did not provide information about the number of people coming and going from the room where Defendant and Smith were staying, nor did they specifically identify anyone who was coming and going from the room. Id.

Sayre could not recall the date on which the *capias* warrant for Smith was issued, but did not dispute that it was issued in 2014 – several years outstanding as of the date he arrested Smith. [9:57:27 to 9:58:10]. And Sayre testified that he did not knock on the door of the motel room in question to determine if Smith was there, because the motel is situated outside of Elkins city limits. [9:58:35 to 9:59:07]. He could not recall a reason for not alerting the county sheriff's department about the situation such that officers with that department could take action in their jurisdiction. Id. Sayre acknowledged that the surveillance of the motel he conducted was located outside of Elkins city limits.[3] Id. As for the cracked windshield on the vehicle in which Defendant and Smith

---

[3] Defendant does not seem to challenge the propriety of Sayre conducting surveillance outside of the municipality for which he was a police officer. The undersigned is not suggesting that such surveillance is

were traveling at the time of the traffic stop, Sayre testified that he observed the cracked windshield when he drove through the motel parking lot on both July 30 and July 31. [9:59:34 to 9:59:46].

Sayre explained that the Elkins Police Department did not have body cameras at the time of the traffic stop. [9:49:48 to 9:49:53]. He also explained that he did not *per se* call Goux for backup, but rather that Goux had heard Sayre call in the traffic stop on the police radio and then proceeded to find Sayre. [10:00:35 to 10:01:15]. Goux was only a few seconds behind Sayre as Sayre initiated the traffic stop. Id.

Sayre testified that, at the traffic stop, when he first walked up to the driver's side window, he explained that the reasons for the stop were (1) the cracked windshield and (2) the active *capias* warrant for the passenger. [10:02:34 to10:03:00]. And when Sayre asked if anything illegal was in the vehicle, Defendant handed over cigar wrappers containing suspected marijuana.[4] Id.

Sayre testified that there are polices and procedures in place for his department regarding vehicle searches, and that those were followed. [10:03:33 to 10:04:08]. Sayre stated that there was no subsequent search of the vehicle and that he did not recall taking photographs during the search of the vehicle. Id.

### B. Goux's Testimony

The Government called Goux to testify. Goux testified that he works as a patrolman with the Elkins Police Department and was working in that capacity at the time he participated in the traffic stop of Defendant's vehicle. [10:18:48 to 10:19:18]. Goux explained that he was familiar

---

improper, and notes this only to clarify that, despite the eliciting of testimony on this point, the nature of the surveillance is not a basis for Defendant's motion to suppress. In any case, the traffic stop itself occurred in Elkins.

[4] At this point in the cross-examination, Sayre also explained that yet a third officer, a Deputy Wolf with the Randolph County Sheriff's Department ("Wolf"), also arrived at the scene of the traffic stop and aided in the search of the vehicle. However, Wolf's presence and participation do not appear to bear on the suppression motion or the analysis herein. The testimony concerning Wolf's involvement was minimal.

with Sayre's investigation and the circumstances leading to the traffic stop, having been advised by Sayre of the tips regarding drug activity at the motel. [10:19:40 to 10:20:03]. Goux also was aware of the *capias* warrant for Smith. Id.

Goux stated that the traffic stop of Defendant's vehicle occurred at a convenience store, located in Elkins. [10:20:10 to 10:20:25]. Goux explained that he was in a separate patrol vehicle during the stop, and positioned his vehicle approximately two or three feet behind Sayre's patrol vehicle. [10:20:26 to 10:20:35]. Goux exited his patrol vehicle as Sayre was approaching the driver's side of Defendant's vehicle; as Goux approached Defendant's vehicle, Smith attempted to exit that vehicle to go into the convenience store. [10:20:36 to 10:21:16]. Both officers ordered Smith to stop. Id. Goux detained Smith and placed handcuffs on her. Id. After he handcuffed Smith, Goux searched Smith incident to arrest and found a small red plastic baggie of suspected methamphetamine on her person, in one of her pockets. [10:21:18 to 10:25:28]. The substance was a white, crystal-like substance, which Goux suspected to be methamphetamine based on his training and experience. Id. Goux also found suspected methamphetamine in Smith's purse. Id. And Goux found a drug ledger in Smith's purse. Id.

The Government's counsel showed Goux a photograph, which Goux stated was a depiction of the vehicle Defendant was operating at the time of the traffic stop. (The Government shared the photograph with Defendant's counsel, but did not seek its admission into evidence). [10:23:12 to 10:23:53].

On cross-examination, Goux confirmed that he detained Smith because of the active arrest warrant. [10:26:00 to 10:26:09]. Goux recalled that Sayre had confirmed Smith's identity by running her in the Randolph County E-911 system both prior to the traffic stop and then again during the traffic stop. [10:26:10 to 10:27:50]. Goux said that Smith's identity was confirmed

8

during the traffic stop by using her driver's license, which was in Smith's possession at the time of the stop. Id.

### C. The Parties' Arguments

At bottom, Defendant argues that the traffic stop in question was improper. As such, Defendant argues, the drug evidence seized from the traffic stop should be suppressed.

First, Defendant argues that Smith was not properly identified as an individual who was the subject of an outstanding *capias* warrant. As a passenger of the vehicle subject to the stop, her identity was not properly confirmed as a condition precedent to the stop. Defendant stresses that the information which law enforcement had about Smith's identity was paltry, and based mostly on a motel employee identifying Smith. Defendant argues that Smith's identity prior to the traffic stop was not based on a particular identifier such as Smith's driver's license. Defendant stresses that the identification of Smith from the limited information provided to Randolph County E-911 was insufficient.

Second, Defendant disputes the condition of the windshield of the vehicle which he was operating at the time of the stop. While a photograph provided in discovery and shown to a witness during the suppression hearing shows the vehicle having a cracked windshield, Defendant does not concede that this is an accurate depiction of the windshield *at the time of the stop*.

For its part, the Government argues that the traffic stop was lawful. As for the warrant for Smith's arrest, the Government stresses that Sayre had a duty to initiate the stop based on his well-founded belief that there was an active warrant for Smith's arrest. At the stop, officers found drugs in multiple locations, so that properly allowed for a search of the entire vehicle, and recovery of all evidence was proper.

As for the cracked windshield, the Government's counsel conceded at the suppression hearing that the size of the crack is not impressive. The Government does not stake its argument on the windshield crack being of a size that obstructs the view in violation of W. Va. Code § 17C-15-36. Rather, the Government insists that the cracked windshield nonetheless constituted defective equipment, which is prohibited under W. Va. Code § 17C-15-1. As such, the Government argues, Sayre had probable cause to initiate the traffic stop for the cracked windshield.

### III. LEGAL ISSUES AND ANALYSIS

The threshold issue here is whether Sayre properly initiated the traffic stop on the basis of (1) the *capias* warrant for Smith and/or (2) the cracked windshield. The undersigned **FINDS** that the stop was proper, for both reasons. As such, if the stop was lawful, then the undisputed facts otherwise show that the subsequent investigatory pat-down of Smith and warrantless search of the vehicle (which yielded the drug evidence in question) were lawful.

### A. Legal Principles

As a threshold matter, the undersigned notes the well-established principle that the Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Moreover, for an arrest, "the general rule [is] that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause." Michigan v. Summers, 452 U.S. 692, 700 (1981).

Further, longstanding caselaw provides that "[s]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the [Fourth and Fourteenth] Amendments . . ." Delaware v. Prouse, 440 U.S. 648, 653 (1979). However, an officer may stop a vehicle to execute an active arrest warrant for an occupant of the vehicle. See United States v. Hensley, 469

10

U.S. 221, 232 (1985); United States v. Thompson, 245 F. App'x 279, 281 (4th Cir. 2007)(per curiam). An officer must have reasonable suspicion to stop a person to determine if they are the person believed to be the subject of an outstanding arrest warrant. See Hensley, 469 U.S., at 232.

Moreover, a law enforcement officer is permitted to stop a vehicle when the officer observes a violation of a traffic law – even if the officer is motivated to conduct the stop for a different reason. See United States v. Ortiz, 669 F.3d 439, 444 (4th Cir. 2012); Whren v. United States, 517 U.S. 806, 810 (1996); United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016) (stating a traffic stop is reasonable at the outset "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. Without question, such a violation may include failure to comply with traffic laws.")(internal citation and quotation omitted).

In West Virginia, defective vehicle equipment is illegal. In particular,

> It is a misdemeanor for any person to drive or move or for the owner to cause or knowingly permit to be driven or moved on any highway any vehicle or combination of vehicles which is in such unsafe condition as to endanger any person, or which does not contain those parts or is not at all times equipped with such lamps *and other equipment in proper condition and adjustment* as required in this article, or which is equipped in any manner in violation of this article, or for any person to do any act forbidden or fail to perform any act required under this article.

W. Va. Code § 17C-15-1 (emphasis added).

Also in West Virginia, under a statute entitled "Windshields must be unobstructed and equipped with wipers," it is provided that "No person shall drive any motor vehicle with any sign, poster, or other nontransparent material upon the front windshield, side wings, or side or rear windows of such vehicle which obstructs the driver's clear view of the highway or any intersecting highway." W. Va. Code § 17C-15-36(a).

11

The "automobile exception" allow for warrantless searches in certain circumstances. "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment ... permits police to search the vehicle without more." Maryland v. Dyson, 527 U.S. 465, 467 (1999)(quoting Pennsylvania v. Labron, 518 U.S. 938 (1996)(per curiam)).

Finally, well-established is the exclusionary rule – that a court should exclude evidence obtained by dint of law enforcement's unlawful arrest or search. See Mapp v. Ohio, 367 U.S. 643 (1961). Relatedly, however, a court should suppress evidence in a criminal matter "only … where its deterrence benefits of exclusion outweigh its substantial social costs." Hudson v. Michigan, 547 U.S. 586, 591 (2006) (citations and quotations omitted).

### B. Analysis

In the case at bar, Sayre properly initiated the traffic stop of the vehicle Defendant was operating. Sayre had (1) reasonable suspicion that Smith was the person who was the subject of the *capias* warrant, and (2) probable cause that there was a traffic violation because of the cracked windshield on the vehicle. Moreover, the resulting investigatory pat-down of Smith and search of the vehicle (which yielded the drug evidence giving rise to the Indictment) were lawful.

*1. Reasonable suspicion to stop for Smith's* capias *warrant*

In his motion, Defendant emphasizes that Sayre suspected Smith to be who she is *only* because a motel staffer purportedly had personal knowledge of Smith's identity, and shared that with Sayre. Defendant also points out that Smith has a fairly common name, such that, without more, Sarye did not have reasonable suspicion that Smith was the subject of the *capias* warrant when Sayre stopped the vehicle.

In making his motion on the basis of information provided in discovery, it appears that Defendant did not have the benefit of additional information adduced during the suppression

hearing. During the suppression hearing, Sayre detailed how he determined Smith's identity prior to the stop. To Defendant's arguments in his motion, no evidence shows that Smith herself provided identification to the motel staff; indications are that Defendant (not Smith) had provided his identification at the outset of the stay, and Smith extended the pair's stay by paying cash. And Defendant is correct that a motel staffer had personal knowledge of Smith's identity. But that was not the end of Sayre's inquiry. Per Sayre's testimony, he determined Smith's middle name to be Marie. Moreover, Sayre obtained Smith's driver's license photograph from Randolph County E-911. He obtained her date of birth, too. As such, Sayre not only knew Smith's gender, but also would have ascertained Smith's race, hair color, and age.

As noted above, an officer must have reasonable suspicion that a person is the subject of an arrest warrant in order to stop that person to ascertain their identity for that purpose. Hensley, 469 U.S. at 232. The Fourth Circuit has specified that "[r]easonable suspicion is a 'commonsense, nontechnical' standard that relies on the judgment of experienced law enforcement officers, 'not legal technicians.'" United States v. Williams, 808 F.3d 238, 246 (4th Cir. 2015) (citation omitted). However, an officer cannot make such a stop based on a mere hunch. Rather, "[t]o justify a stop, the officer 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.'" United States v. Slocumb, 804 F.3d 677, 682 (4th Cir. 2015) (citation omitted). "The level of suspicion must be a particularized and objective basis for suspecting the particular person stopped of criminal activity." Id. (citations and quotations omitted).

Here, the "criminal activity" which Slocum would have Sayre be able to articulate is Smith's failure to appear for court, resulting in the *capias* warrant. To this end, along with Smith's complete name, Sayre certainly had a sense of what Smith looked like, from the driver's license

13

photo provided by Randolph County E-911. He then observed a person matching that description in the vehicle with Defendant – and did so very soon after motel staff had told him that the pair were leaving the motel. What is more, Sayre was surveilling the motel from a nearby parking spot, underscoring how closely in time he observed the pair departing from the motel. And then very soon after *that*, he initiated the traffic stop. Thus, it is difficult to find fault with Sayre's efforts or suggest what additional information he should have obtained prior to making the stop for Smith's outstanding *capias* warrant. Thus, the undersigned **FINDS** that Sayre had reasonable suspicion to initiate the stop based on an outstanding arrest warrant for Smith.

*2. Probable cause to stop for cracked windshield*

The issue here is whether the cracked windshield gave rise to probable cause for a violation of traffic laws, such that Sayre's stop of the vehicle was lawful.[5] Sayre testified during the suppression hearing that he initiated the traffic stop for the cracked windshield on two bases: obstruction of view and defective equipment.

Defendant does not dispute that the windshield was cracked, but *does* dispute that the crack was pronounced enough to obstruct the driver's view in violation of W. Va. Code § 17C-15-36(a). And the Government noted during the suppression hearing that the size of the crack was not remarkable. Nonetheless, the Government clarified that it was not relying on obstruction of view under W. Va. Code § 17C-15-36(a) to argue that probable cause existed. Rather, the Government stated that it was relying on W. Va. Code § 17C-15-1, which prohibits defective equipment on a vehicle, to argue that Sayre had probable cause for the stop.

"Probable cause is judged by an analysis of the totality of the circumstances . . . which are weighed not in terms of library analysis by scholars, but as understood by those versed in the field

---

[5] During the suppression hearing, no documentary or photographic evidence was introduced to demonstrate the purported condition of the windshield.

of law enforcement. Under this pragmatic, common sense approach, we defer to the expertise and experience of law enforcement officers at the scene." U.S. v. Dickey-Bey, 393 F.3d 449, 453 (4th Cir. 2004)(citations and quotations omitted).

In the instant case, Sayre testified that he had noticed the cracked windshield, twice, when he saw the vehicle in the motel parking lot, earlier in his investigation. He noted the cracked windshield again when the vehicle was in operation by Defendant, and decided to make the traffic stop, in part, because of the cracked windshield. Again, there is no dispute that the windshield was cracked – only about whether the crack was large enough to obstruct a view. As such, there appears to be no serious dispute that a cracked windshield constitutes defective equipment in violation of W. Va. Code § 17C-15-1. Thus, the undersigned **FINDS** that there was probable cause to initiate the traffic stop on the basis of a traffic violation for defective equipment.

*3. Propriety of investigatory pat-down of Smith and search of vehicle*

Both the investigatory pat-down of Smith and the search of the vehicle in which Defendant and Smith were traveling, were lawful.

Among the exceptions to the requirement to obtain a warrant is the circumstance where the search of a person is incident to an arrest of that person. "[A] police officer who makes a lawful arrest may conduct a warrantless search of the arrestee's person and the area 'within his immediate control.'" Davis v. United States, 564 U.S. 229, 232 (2011) (citation and quotation omitted). The policy behind this exception is to remove any weapons an arrestee may possess and to secure evidence. United States v. Davis, 997 F.3d 191, 195 (4th Cir. 2021).

Incident to an arrest of vehicle's occupant, law enforcement may conduct a warrantless search of the vehicle if it is "reasonable to believe evidence relevant to the crime of arrest might

15

be found in the vehicle." Arizona v. Gant, 556 U.S. 332, 343 (2009) (citation and quotation omitted).

In the instant matter, according to Sayre's uncontested testimony, when he first interacted with Defendant at the traffic stop, Defendant admitted to the possession of marijuana. Such possession is illegal in West Virginia. This alone was a legitimate basis for a search of the vehicle under the automobile exception.

In any case, Goux patted down Smith incident to her arrest. Sayre searched the vehicle, as part of Smith's arrest and/or as a result of Defendant's marijuana possession. Together, these searches yielded methamphetamine, a drug ledger, and a large amount of currency – all evidence which the Government seeks to admit. Because the undersigned finds that the traffic stop was lawful to determine Smith's identity and effect arrest under the *capias* warrant, the undersigned **FINDS**, then, that the search of her person was proper. Further, because the stop to arrest Smith was lawful, and because of Defendant's admission to possessing marijuana, the undersigned **FINDS** that the corresponding search of the vehicle was lawful.

## IV. CONCLUSION

For the reasons set forth herein, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Physical Evidence [ECF No. 55] be **DENIED.**

Any party shall have fourteen days from the date of filing this Report and Recommendation within which to file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.** A copy of such objections should also be submitted to the United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages,

including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk of Court is **DIRECTED** to transmit copies of this Report and Recommendation to counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted November 14, 2023.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE